IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COLUMBIA GAS TRANSMISSION CORPORATION, | ) ) ) | CASE NO. 1:04 CV 1338 |
| Plaintiff, | ) ) | MAGISTRATE JUDGE WILLIAM H. BAUGHMAN, JR. |
| v. | ) ) ) | |
| BRADLEY E. ALLY, *et al.*, | ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendants. | ) | |

## I.  Introduction

Columbia Gas Transmission Corporation (Columbia) brought this diversity action against Bradley E. Ally and the Ally Family Revocable Living Trust (the Allys) to enforce a prescriptive easement or setback granted to Columbia on property owned by the Allys for the purpose of operating a natural gas storage well.[1]  The Court previously held that Columbia has a legally valid easement for so much of the Ally property as is reasonably necessary and convenient to operate Columbia's well, the dimensions of such setback to be determined as a question of fact.[2]

Accordingly, Columbia's motion for partial summary judgment was granted, narrowing the remaining issues to a factual determination of the size and configuration of the

---

[1] *See*, ECF # 60 at 1.

[2] *Id.* at 15.

setback around the well which Columbia could enforce against the Allys and a legal finding as to the appropriate remedy for enforcing any rights created by such easement.

A bench trial was held on the factual question of the dimensions of the setback,[3] after which the parties submitted proposed findings of fact and conclusions of law.[4]   Final arguments were made on November 3, 2006.[5]   Upon consideration of the testimony, evidence, and arguments presented, the Court now makes the following findings of fact and conclusions of law.

## II.   Findings of Fact

### A.   Incorporation of prior findings and judicial notice

1.    The Court incorporates by reference the findings of fact concerning the parties and its jurisdiction contained in its previous Order granting partial summary judgment to Columbia.[6]

2.    The Court incorporates by reference the findings of fact concerning the original 1928 lease and the 1937 supplemental agreement contained in its previous Order.[7]

---

[3] ECF ## 71, 72.

[4] ECF # 79 – Columbia; ECF # 80 – the Allys.

[5] ECF # 81.

[6] ECF # 60 at 1-2.

[7] *Id.* at 2-3, 10-15.

3.      The Court incorporates by reference the findings of fact concerning when and under what circumstances the permanent residence, garage, barn, outbuilding, and fence were constructed on the Ally property.[8]

4.      The Court incorporates by reference those facts of which it has taken judicial notice at the request of Columbia and the Allys.[9]

**B.      Topography of the Ally property and building location**

1.      <u>North of the well</u>.  Columbia's storage well is situated on the Ally property such that a wooded hill begins to rise at a 25-30 degree angle[10] approximately 20 feet behind and to the north of the well.[11]  The treeline at the base of the hill extends on roughly an east-west line behind the well from the western boundary of the Ally property to the ditch.[12]

2.      <u>East of the well</u>.  Approximately 80 to 100 feet to the east of the well, a creek or ditch, which intermittently contains flowing water,[13] bisects the Ally property from north to south.[14]

---

[8] *Id*. at 3.

[9] ECF # 75 – request for judicial notice by the Allys, granted by non-document order; ECF # 76 – request by Columbia for judicial notice, granted by non-document order.

[10] ECF # 71 at 46.

[11] Jt. Ex. 2 (20 feet), ECF # 71 at 125 (20 feet – Davis); *but see*, ECF # 72 at 325-26 (30-40 feet – Ally).

[12] Jt. Ex. 2.

[13] ECF # 72 at 328.

[14] Jt. Ex. 2.

3.    West of the well.  Due west of the well along the treeline stands a garage, located about 160 feet from the well, and the permanent residence of the Allys, located 250 feet from the well.[15]

4.    South of the well.  To the south of the well is an open field for approximately 200 feet, which area includes an unpaved access road running east to west across that field.[16] At a point 200 feet south of the well, this area is bisected by a wood/wire pasture fence[17] and then, approximately 50 feet further to south or 250 feet from the well, there is a horse barn.[18] This area is known variously as the "South Field" or the "Southwest Quadrant."

5.    The Court finds that the location and comparative distances of the well, ditch, hill, roads, structures, and fencing on the property are accurately depicted on Joint Exhibit 2.

6.    The Court further finds that another open field exists to the east of the ditch.[19] A storage shed is present in this field approximately 200 feet from the wellhead.[20]  This area, known as the "east field," is not fully depicted on Joint Exhibit 2.

---

[15] *Id.*

[16] *Id.*

[17] *Id.*, *see also*, ECF # 72 at 322, 324.  There seems to be some evidence of a second fence (*see*, *e.g.*, ECF # 71 at 139), but such a second fence is not depicted on Joint Exhibit 2.

[18] Jt. Ex. 2; *see also*, ECF # 72 at 319.

[19] *See*, Jt. Ex. 1.

[20] ECF # 40 (Stipulations) at ¶ 22.

C.    **Nature of the structures**

1.    The Court finds that the permanent residence, the garage, and the barn are all in regular use by the Allys.[21]  The garage, or shop, is used to work on motorcycles.[22]

2.    The Court finds that the permanent residence and the garage are constructed such that they are essentially permanent structures and cannot be quickly dismantled and moved.[23]

3.    The Court finds that although the barn and fencing are constructed to be dismantled if required,[24] neither structure is inherently mobile or capable of being moved without first being dismantled..

4.    The barn and the area within the adjacent wire fence regularly contain a horse.[25]

D.    **Current use and condition of the well**

1.    The well operated by Columbia on the Ally property is used as a natural gas storage well.[26]  As such, natural gas is pumped into the well during the spring and summer and then removed for use during high demand periods of fall and winter.[27]  The gas that is

---

[21] *See*, ECF # 72 at 314-15, 319.

[22] ECF # 71 at 73-74.

[23] ECF # 72 at 314-15.

[24] *Id.* at 433-34.

[25] *Id.* at 322.

[26] ECF # 71 at 8-9, 44.

[27] *Id.* at 56-58.

removed from the well is then transmitted by a pipeline connected to Columbia's pipeline system.[28]

2.    The well on the Ally property is known in the Columbia Gas system as Well 6111.[29]

3.    Well 6111 is constructed such that the pipe that actually carries gas away from the well – known as the flow or production string – is surrounded by a protective outer casing.[30]  The production string is anchored in cement at the bottom of the well within the outer casing to provide support for the production string, and cement is used to fill the space between the production string and the outer casing to preclude corrosion.[31]  This space between the production string and the outer casing is known as the annulus.[32]  However, unlike newer wells, Well 6111 has no cement or other filling between the production string and the outer casing all the way to the top of the well.[33]  Well 6111 is, therefore, said to have an open annulus since it does not completely seal the inner production string within the outer casing.[34]

---

[28] *Id.* at 8-9.

[29] *Id*. at 6.

[30] ECF # 72 at 112-13, 240-41.

[31] ECF # 71 at 113-14.

[32] *Id*. at 114.

[33] ECF # 72 at 241-42.

[34] *Id.* at 241.

-6-

4.    Well 6111 now has been determined to have a leak of natural gas from the production string into the open annulus.[35]

5.    As a consequence of this leak, Well 6111 is scheduled to undergo repairs in 2008.[36]

**E.    Types of activity reasonably required or potentially required at a well**

1.    The Court finds that all natural gas wells reasonably require or potentially require three different types of activities from time to time:  (a) routine maintenance and operations, (b) major maintenance, and (c) emergency response.

2.    Routine maintenance and operations – which vary in frequency depending on the season[37] – are usually performed in close proximity to the well by no more than a few people and requires little space beyond the ability to drive a vehicle to the wellhead.[38]  There have never been any difficulties in performing routine maintenance at Well 6111, even with the current structures and fencing.

3.    Major maintenance requires space for equipment and personnel not present for routine maintenance.  Examples of major maintenance, which can reasonably be expected

---

[35] *Id.* at 262-63, 426-27.

[36] *Id.* at 263.

[37] *Id.* at 313.

[38] *See,* ECF # 71 at 6.

to be required, if not on a regular basis, include:  (a) well stimulation, (b) reconditioning of the well, (c) coil tubing and flow back operations, and (d) drilling a new well.[39]

4.     During some operations conducted as part of such major maintenance activities, large equipment needs to be onsite and needs to be widely spaced to reduce the threat of fire,[40] and, at times, gas needs to be released and flared or burned.[41]  In addition, storage area for new and old pipes as well as solid and fluid refuse must exist in proximity to the well.[42]

5.     Some of these activities are governed by state law,[43] such as the location of any flaring in relation to inhabited structures[44] and the minimum space that must be maintained between equipment.[45]

6.     Columbia successfully performed one major maintenance operation at Well 6111 in 1971, prior to when the current structures were completed.[46]

---

[39] *Id.* at 129-47.

[40] *Id.* at 141-42.

[41] ECF # 72 at 231-32

[42] ECF # 71 at 136-37.

[43]  As noted, the Court has taken judicial notice of pertinent Ohio statutes and administrative regulations.

[44] Ohio Admin. Code § 1501:9-9-05(B).

[45] Ohio Admin. Code §§ 1501:9-9-04, 05.

[46] ECF # 72 at 371-72; *see also*, ECF # 72 at 313.

7.    The repairs scheduled to be done at Well 6111 in 2008 are major maintenance operations in that they will involve a reconditioning of the well to seal the open annulus.[47]

8.    Emergency operations for a natural gas well are fundamentally based on the fact that natural gas is inherently volatile and combustible.[48]  Moreover, gas within the well/pipeline is under pressure,[49] such that a leak may potentially linger as a flammable cloud[50] or, if ignited, explode[51] or burn as a "fire ball" over an area 100-feet in all directions.[52]  A gas well fire at Well 6111 would consume the same amount of energy within one hour as 12,500 typical backyard gas grills or 6,250 typical home heaters burning at their full capacity.[53]

9.    To reasonably prepare for an emergency, an operator of a well would need to have a safety setback that would provide for the quick escape of any personnel that may be onsite at the time the emergency occurred[54] and eliminate sources of ignition,[55] as well as an

---

[47] *Id*. at 263.

[48] *Id.* at 238.

[49] *Id.* at 240; ECF # 71 at 48.

[50] ECF # 71 at 155-56.

[51] ECF #72 at 262.

[52] ECF # 71 at 161.

[53] ECF # 72 at 262-62.

[54] ECF # 71 at 142-43.

[55] ECF # 72 at 262, 264-65.

operational setback of sufficient space to quickly assemble and operate emergency equipment beyond the reach of any fire or escaping gas.[56]

10. Bulldozing or otherwise removing existing structures as a way of creating either emergency escape routes or areas for operating emergency equipment does not address the need for immediacy inherent in escape routes nor is it without the risk of creating a spark that could ignite leaking gas.[57]

11. The presence of fenced or stabled horses in an area needed for emergency response to a fire or explosion presents an inherent danger both to the animals and to escaping personnel.[58]

12. The presence of fencing across potential escape routes presents an inherent danger to personnel seeking to quickly flee an emergency situation while running "like hell" in a "panic mode."[59]

---

[56] *See, id.* at 255.

[57] ECF # 71 at 159.

[58] *Id*. at 158-59.

[59] *Id*. at 142, 192.

13. While emergencies at natural gas wells are not, by definition, usual or predictable events,[60] emergencies at natural gas wells, including leaks[61] and fires,[62] do occur and have occurred in Ohio.[63]

14. New well technologies, such as down hole safety valves, can operate to shut off gas from flowing into the production string.[64]

15. By definition, a valve can only preclude gas from proceeding past the point where the valve is installed but cannot influence the behavior of gas that may be escaping from below the valve or has already escaped.

16. Taking reasonable measures, such as creating a safety setback to minimize risk of ignition and to provide for quick escape, as well as creating an operational setback to permit the assembly and use of emergency equipment around a natural gas well, is both required by various aspects of the law[65] and recognized by industry practice.[66]

---

[60] *Id.* at 187.

[61] *Id*. at 150.

[62] *Id.* at 149.

[63] *Id*. at 151.

[64] ECF # 72 at 409.

[65] *See*, Ohio Admin. Code § 1501:9-9-02 requiring that entities "in control" of natural gas wells undergoing major maintenance "shall use all reasonable means to safeguard against hazards to life, limb and property." *See also*, Ohio Admin. Code § 1501:9-1-02(A)(5) requiring that an application for a permit to modify a natural gas well include a map showing the location of all buildings, roads, and streams within 200 and 500 feet of the well.

[66] *See*, ECF # 71 at 154, 163, 194; ECF # 72 at 239.

**F.**     **Size and configuration of reasonable and necessary setbacks at the Ally property**

1.     Columbia generally asserts a claim to a setback of 300 feet as a radius around a natural gas well.[67]

2.     Columbia admits that even a 300 foot setback might not be sufficient for every possible catastrophic situation.[68]

3.     Columbia will accept setbacks of less than 300 feet, or configured other than as a radius, when topographical conditions so dictate.[69]

4.     Columbia permitted the Allys to place a mobile home 250 feet from the wellhead.[70]

5.     On the Ally property, the area directly to the north of the well – the wooded hill – is not easily usable as an operational setback nor does it provide a quick escape route, but it is otherwise suitable as a safety setback since it contains no inhabited structures nor sources of ignition.[71]

6.     The area to the east of the well, containing the ditch and the east field, appears usable as a safety setback since there are no inhabited structures or sources of ignition

---

[67] ECF # 71 at 79-80, 132, 163-64.

[68] ECF # 71 at 187.

[69] *See*, *id.* at 126-27, 157.

[70] *Id*. at 66-68.

[71] *Id*. at 126-27.

present.[72]  However, it is not usable as an operational setback since any emergency operations based in the east field intended to remedy a problem at the well would necessarily have to cross the ditch, potentially causing liability for interference with a protected waterway.[73]

7.    The southwest quadrant would be usable as a safety setback (a) if sources of ignition were removed or remained a reasonable distance from the well, (b) if any impediments to rapid escape, such as fencing, were removed or remained a reasonable distance from the well, and (c) if a sufficiently large contiguous area were present to assemble and operate equipment for use at the well.[74]

## III.   Conclusions of Law

### A.    Introduction

In confronting agreements identical to those in this case, the Sixth Circuit in *Columbia Gas Transmission Corporation v. Zeigler*[75] held that the agreements "provide Columbia with the right to call for a setback if it is 'reasonably necessary and convenient' for the purpose of storing gas in the well of the subject area."[76]  Further the court observed that the question

---

[72] The cold storage outbuilding in the east field is not an inhabited dwelling, nor was there any testimony that it is wired for electricity or used in a regular manner so as to present a source of possible ignition.

[73] *Id.* at 120, 127, 157.

[74] *Id.* at 157-58.

[75] *Columbia Gas Transmission Corp. v. Zeigler*, 83 F. App'x. 26 (6th Cir. 2003).

[76] *Id.* at 30.

of what constitutes a reasonably necessary and convenient setback is "particularly fact-sensitive."[77]

The obvious implication of the template rightly established by *Zeigler* for this case, and for the interpretation of like agreements executed with respect to other properties, is that the distance of the setback from the well for any given property will depend upon the circumstances unique to that property.  There is no blanket rule, no cookie cutter approach that can apply to all cases.

As discussed above and below, the topography of the Ally property demands the fashioning of a setback different from that which might be appropriate if that property contained a well surrounded by level and unencumbered ground in all directions.  Columbia should not and must not assume that the decision in this case creates a model footprint that can be exactly replicated at other wells on other properties.

As the Court discussed with counsel at various junctures in this proceeding, a far better approach would have been agreements that contained definite, enforceable setbacks established at the inception of the relationship between the company and the land owner at the time of the lease supplement which established the right to operate a gas storage well on that given parcel of land.  Unfortunately here, and apparently at numerous other properties in Columbia's service area, that was not done.

Consequently, as *Zeigler* makes clear, the exact dimensions of the setback right conferred by the lease supplement must now necessarily be the result of a unique,

---

[77] *Id.*

-14-

fact-specific inquiry in each case and not the routine imposition of a standard mathematical formula on every case.  This leaves the company and the current landowners in the awkward position of either needing to negotiate the setback or, as here, litigating the fact-sensitive question of the setback reasonably necessary and convenient under the unique circumstances presented.

**B.     Conclusions**

1.     Columbia is entitled to so much of a setback around Well 6111 as is reasonably necessary and convenient to accomplish its purpose in operating a natural gas storage well.

2.     Operating a natural gas storage well requires that an operator have a setback reasonably necessary and convenient to provide for: (1) standard operational activities, (2) routine maintenance, (3) major maintenance, and (4) emergencies.

3.     Conducting standard operations and routine maintenance requires only a minimally clear area around the well for a few workers as well as clear access to the well by vehicles, such as a pickup truck.

4.     Beyond routine maintenance, major maintenance and emergency activities require both a safety setback and an operational setback.  A safety setback is an area within which there are no sources of ignition or impediments to quick and easy escape for any persons who may be present.  An operations setback is an area within which the well operator can assemble and operate equipment needed to perform any major maintenance or respond to an emergency.

5.     A safety setback must protect persons and property from dangers associated with a natural gas leak by minimizing or eliminating near to the well: (1) sources of ignition, and (2) the presence of inhabited structures, as well as (3) ensuring an clear zone within which any person may escape an emergency.

6.     Maintaining an operational setback for major maintenance and emergency equipment means providing a contiguous area where necessary vehicles and equipment can reasonably be expected to access both the assembly site and the wellhead and to operate together at the site, as well as for on-site storage.

7.     Given that a reasonably prudent operator cannot predict the prevailing wind pattern at the time a leak or fire might take place, it is reasonable to have the safety setback delineated as a radius on all sides from the wellhead rather than as an aggregate of space proximate to the wellhead on any one side.

8.     However, a radius setback is reasonably more necessary to protect persons and property from sources of ignition and from impediments to escape than it is to provide for an access and assembly area, which may still be reasonably accomplished within some aggregate of contiguous space.  Thus, a safety setback may differ in size and configuration from the contiguous area of an operational setback.  The operational setback, therefore, need not be in the configuration of a circle or a section thereof emanating from the wellhead.

9.     Therefore, the Court concludes that, consistent with the parties' prior agreement as to the mobile home, the applicable laws and regulations, case law, as well as the evidence adduced at trial, Columbia is entitled to a reasonable safety setback of 250 feet in all

-16-

directions from the well, such area to be permanently free from any sources of ignition, inhabited or regularly used structures, and any barriers to rapid escape, such as, but not limited to, fencing.

10.    The Court further concludes that Columbia is entitled to a reasonable operational setback of 70,686 square feet[78] solely within the southwest quadrant, such area to be permanently free from fencing, but may include the existing barn, subject to this structure being removed by Columbia in the future if needed for assembly of equipment required for major maintenance.  This operational setback may be accommodated by an area in a configuration other than a quarter circle from the wellhead in the quadrant.  Specifically, the Court observes that a rectangular area bounded by the well meter at the northwest corner, the house on the northeast corner,[79] and points due south of those corners at a distance of 250 feet would provide a total area of approximately 76,250 square feet.  Although under some possible configurations the residence may be within this operational setback area, its location directly at the foot of the hill makes it functionally the equivalent of an extension of the hill for purposes of determining usable space within the operations area, and, so, the

---

[78] This is the equivalent of the area of a quarter circle with a radius of 300 feet from the wellhead.

[79] The approximate distance from the well meter to the house is 305 feet according to the measurements set out on Jt. Ex. 2.  It should be noted that there is additional, usable area to the west between the meter and the ditch, the exact measurement of which does not appear on that exhibit, but which one witness estimates to be 40 to 45 feet.  ECF # 72 at 372. (Michael Whims testified that the distance between the wellhead and the ditch is 95 to 100 feet.  Jt. Ex. 2 shows the distance between the wellhead and the meter as 55 feet.)

residence is not subject to either immediate removal or conditional removal for equipment assembly required for major maintenance.

11.   The Allys shall, consistent with the agreement as to the mobile home, hold Columbia harmless for any injuries or damages to persons or property at the permanent residence or the barn arising from Columbia's operations in the exercise of its rights under the lease as supplemented.

12.   The removal of any structures, including fencing, within the 250-foot radial safety setback is to be done by Columbia at its expense, but such removal may be done at any time by Columbia subject only to a 90-day notice.  The Court finds no support for the position that the structures here were erected out of hatred, ill will, or a spirit of revenge or in conscious disregard for an established, enforceable safety zone or operational setback of the dimensions now described.[80]  Accordingly, the Court finds no basis for the award of attorneys fees.[81]

13.   Columbia retains the right to use so much additional area beyond that specified here and to take such actions as may be needed to respond to a genuine emergency.

14.   Nothing in this Order shall be construed as prohibiting the parties from altering by mutual agreement the size or configuration of the setbacks, nor the permitted structures within such setbacks, delineated by this Order.

---

[80] *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 445-56, 659 N.E.2d 1242, 1247 (1996).

[81] *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 558, 644 N.E.2d 397, 402 (1994).

15.   The Court retains continuing jurisdiction to enforce the terms of this Order.

**IT IS SO ORDERED.**

Dated:   December 7, 2006                    <u>s/ William H. Baughman, Jr.</u>
                                             United States Magistrate Judge